747 So.2d 620 (1999)
Austin TUCKER & Beverly Tucker, Plaintiffs-Respondents,
v.
AMERICAN STATES INSURANCE (A Part of Lincoln National Corp.), American National Property and Casualty Co. and the Unopened Succession of Ora Mae Bland, Defendants-Applicants.
Nos. 31,970-CW, 31,971-CW.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1999.
*621 Hicks & Hubley by S. Maurice Hicks, Shreveport, Counsel for Defendant-Applicant, American National Property & Casualty Co.
Cook, Yancey, King & Galloway by Brian A. Homza, Shreveport, for Defendant-Applicant, American Central Insurance Co.
Lunn, Irion, Johnson, Salley & Carlisle by James A. Mijalis, Penny N. Nowell, Shreveport, Counsel for Defendant, United Fire & Casualty.
*622 Jack M. Bailey, Jr., Shreveport, Counsel for Plaintiffs-Respondents.
Before BROWN, PEATROSS and DREW, JJ.
DREW, J.
In this matter remanded from the supreme court, the issue is whether a legal duty existed and/or was breached by the landowner who involved himself in the limb cutting operation during which plaintiff was injured. For the following reasons, we find that the trial court erred in denying the motions for summary judgment filed by the insurance companies. The judgment is reversed.

FACTUAL AND PROCEDURAL BACKGROUND
On June 6, 1994, Austin Tucker, a 57-year-old Baptist minister, fell while trimming tree limbs and sustained injuries which left him a paraplegic. During a financially difficult period, Tucker and his wife Beverly were living rent free in a house owned by Beverly's father (Everett Bland) and her uncle (Harold Bland). The Bland brothers inherited the property from their mother, Ora Mae Bland, who had died in January 1994. In exchange for living there, the Tuckers agreed to perform repairs and maintenance to the property. Among others, the Tuckers sued United Fire & Casualty Company, liability insurer of Harold; American Central Insurance Co., liability insurer of Harold; and American National Property and Casualty Company (ANPAC), liability insurer of the Bland's deceased mother, Ora Mae Bland.
The trial court granted summary judgments in favor of American Central, United Fire and ANPAC and dismissed plaintiffs' claims with respect to strict liability. The trial court further denied the insurers' motions for summary judgment based upon any causes of action for negligence. The three insurers then sought supervisory relief from this court in two writ applications which this court denied. This court stated that genuine issues of material fact existed as to the relationship between plaintiffs and Harold Bland, what transpired and what was said by each before the accident occurred. We held that those disputed issues precluded summary judgment. The insurers then sought relief from the supreme court which, in initial and supplemental orders, granted and remanded the writs to this court for briefing, argument and opinion.
Accompanying the motions for summary judgment and the plaintiffs' oppositions are memoranda with attached depositions and portions of depositions, plus an affidavit and discovery response.

Austin Tucker's Depositions
Austin Tucker stated that his wife made all the arrangements with her family for the Tuckers to occupy her deceased grandmother's home. Tucker's understanding was that, in exchange for the Tuckers' cleaning, repairing and maintaining the property, they would reside there temporarily during a transition period in his career. His testimony was that the arrangement provided the mutual benefits of giving the Tuckers a place to stay and the Blands occupants for their vacant property.
After his morning devotional on the day of his fall, Tucker jogged approximately three miles and returned to the house where he made a shake which he placed in the freezer. He went outside about 7:30 or 8:00 a.m. to begin working on the list of things he had planned to do that day. Neither of the Blands had assigned him the duty of trimming the damaged pine trees, and he had no prior discussion with them about trimming the trees. In maintaining his own rental property, he had frequently trimmed trees.
When Tucker's chain saw broke first thing, he used the bow saw by hand for approximately one and a half to two hours. Tucker did not recall taking any breaks for water nor did he ever drink his shake. *623 First he went on top of the garage to trim limbs he could reach. Then he carried a heavy aluminum extension ladder to a second tall pine tree. Tucker used a rope to tie the ladder to the tree as an extra precaution and because he had planned to use the rope to hoist his chain saw. Tucker went up and down the ladder several times during the task. Tucker acknowledged he had growing signs of exhaustion which he fought because he wanted to get the job finished. A good while prior to Harold's interjecting himself into the operation, Tucker had become exhausted and periodically had stopped to rest, to catch his breath and to clear his head.
Harold arrived and insisted Tucker use a chain saw instead of the bow saw. Although Tucker initially declined it, he accepted it to accommodate Harold who did not attempt to start his saw before handing it to Tucker. Tucker estimated he attempted to start Harold's chain saw maybe three to six times, but that it did not fire. Tucker did not check the gas level himself but Harold told him to lower the chain saw back down for Harold to gas it up. As soon as Harold had the chain saw, Tucker started down the ladder. He had descended two or three rungs when Harold turned and told Tucker to stay up there and that Harold would hand the saw back to Tucker. Tucker attempted to climb back up the ladder. Knowing he was losing consciousness, Tucker tried to put his head and shoulders between a rung and the ladder to brace himself. He fainted very quickly and fell.
In Tucker's view, Harold took over the project which he passed on his way to do something else. Tucker opined that Harold was wrong to tell Tucker to remain in the tree even though Harold did not know that Tucker was exhausted. Harold had no reasonable way of knowing that Tucker was exhausted and about to faint, because Tucker never told Harold he felt faint and admitted he was not eager to admit he was feeling faint. Tucker opined that Harold was wrong by passing up the chain saw without gas and unintentionally exhausting Tucker further. While Harold did not instruct Tucker which branches to cut, Harold supervised by telling Tucker to stay in the tree while Harold got a chain saw and passed it to Tucker. When the saw would not start, Harold told Tucker to stay on the ladder while Harold gassed up the saw.
As to why he stayed in the tree even though he was exhausted, Tucker explained that to get along with Harold, one had to let Harold have his way which was how he was conditioned to working with Harold through the years. Tucker stated that Harold had never hit him, threatened Tucker or his wife, or cursed or verbally abused him. In addition, Tucker characterized himself as a workaholic which he defined as one who works excessively and compulsively sometimes to an unhealthy extent and fails to use good judgment. That description applied to him regarding the work leading to the accident and his career in general. He also admitted that he obviously made some poor judgment calls leading up to the accident, particularly in following Harold's directions to stay in the tree while he was exhausted. Tucker's stated reasons were that Harold was senior to him and had a take-charge attitude so Tucker tried to accommodate him. An additional factor Tucker reported was that his judgment was already impaired by his extreme exhaustion.

Beverly Tucker's Deposition
Beverly Tucker stated that her husband had not been ordered to trim the trees by either Harold or Edgar Bland. She confirmed that he was experienced in trimming trees. The couple had spent approximately $1,800.00 on improvements and painting Beverly had done in the house with a friend.

Harold Bland's Deposition and Discovery Response
Harold Bland stated that his brother informed him that the Tuckers were to move into the home temporarily until they *624 worked out their financial problems. In exchange, Beverly would repaint and the couple would "do things" to the house. Harold never talked to the Tuckers directly, but his understanding was that they would live there rent-free and do chores.
On the date of the accident, Harold arrived about 7:30 a.m. to check his cattle. Harold encountered Tucker with a step ladder. In response to Harold's inquiry, Tucker stated he was going to trim tree limbs extending over the garage. When Harold offered to assist Tucker, Tucker stated he did not need assistance. When Harold returned from the pasture 45 minutes to one hour later, Tucker had an extension ladder propped against a tree, and was standing on a limb cutting with a hand bow saw. When Harold inquired why Tucker was not using a chain saw for his work, Tucker stated it was broken. Tucker accepted Harold's offer of the use of Harold's chain saw. Harold first passed a rope to Tucker, which Tucker used to tie the ladder to the tree, and then Harold got the chain saw.
After starting the chain saw to test it, Harold passed the saw up to Tucker. Although Tucker tried six to eight times, the chain saw would not start. Tucker passed the saw back to Harold to see if it was out of gas. As Harold was going for gas, he heard a racket, turned and saw Tucker on the ground. Harold did not see any indication that Tucker was in distress nor did Tucker tell Harold he was having problems. Harold denied that Tucker stated he was ready to come down and further denied that he instructed Tucker to stay in the tree. Harold also disputed that he in any way supervised Tucker's work, since he did not know what limbs he was trimming and did not instruct Tucker in any way. Harold's only contact was in giving Tucker the rope and the saw.
An answer to interrogatories stated that before Harold's 1987 retirement, he served as Steel Forgings Quality Control Manager over areas including safety meetings.

Edgar Bland's Deposition
Beverly Tucker's father, Edgar Bland, stated his daughter approached him about the Tuckers living in the house, since they needed a place to live. Edgar indicated that he and Beverly had talked to his brother, Harold, and it was mutually agreed the Tuckers would live in the home. The Tuckers performed labor themselves and paid for labor and materials for improvements such as paint and carpet. When the Tuckers returned to the house in May 1994, there was no plan in place concerning the work Tucker was to perform. The Tuckers were to treat the property as their home and do whatever was needed to keep it looking nice. Edgar never heard of Harold assigning Tucker specific tasks. Edgar never directed Tucker to trim limbs and did not hear of Harold making such an assignment.

Affidavit of Mary Emma Heiser Bland
After the helicopter transported Tucker to the hospital, Harold told Mrs. Bland, the wife of Edgar and the mother of Beverly Tucker, that he had tried to start the chain saw, but could not, so he passed it up for Tucker to try. When Tucker could not start the chain saw, Harold remembered it was out of gas and had Tucker send the saw down for gas. When Harold turned to go get gas, he heard Tucker fall from the tree.

SUMMARY JUDGMENT
Appellate courts review summary judgments de novo under the same criteria that govern the trial court's consideration of whether summary judgments are appropriate. Summary judgments are governed by La. C.C.P. art. 966, which was amended in both 1996 and 1997. Since the amended versions of the article are procedural in nature, they are subject to retroactive application. As amended, La. C.C.P. art. 966 provides that summary judgment procedure is favored and designed to secure the just, speedy, and inexpensive determination of actions. If the pleadings, depositions, affidavits, answers *625 to interrogatories, and admissions on file show that there is no genuine issue as to a material fact, then the movers are entitled to summary judgment as a matter of law. A fact is material if its existence or nonexistence may be essential to the plaintiff's cause of action under the applicable theory of recovery. Theilmier v. Louisiana Riverboat Gaming Partnership, 31,739 (La. App.2d Cir.3/31/99), 732 So.2d 620.
The burden of proof on a motion for summary judgment is on the mover. However, if the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover's burden does not require him to negate all essential elements of the adverse party's claim. The mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim. If the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C). Theilmier, supra.

DISCUSSION
In this matter, the trial court granted summary judgments in favor of these three insurers on the issue of strict liability and that portion of plaintiffs' action has been dismissed. That summary judgment is not at issue. Because plaintiffs' action is based upon the alleged negligence of Harold Bland, this summary judgment issue must be examined using the duty/risk analysis. La. C.C. art. 2315. For liability to attach, the plaintiff must establish that:
(1) The conduct in question was a substantial factor in bringing about the harm to the plaintiff, i.e., it was a cause-in-fact of the resultant harm;
(2) The defendant owed a duty to the plaintiff;
(3) The duty owed was breached;
(4) The risk, or harm caused was within the scope of protection afforded by the duty breached; and
(5) Actual damages were sustained.
Pitre v. Louisiana Tech University, 95-1466, 95-1487 (La.5/10/95), 673 So.2d 585; U.S. cert. denied.
In opposing the three insurers' motions for summary judgment, the Tuckers argue that there were numerous material factual disputes and issues of credibility as to what transpired which made summary judgment inappropriate. The depositions and other documents filed in connection with the summary judgments reveal numerous discrepancies in accounts of events prior to Tucker's fall. For purposes of deciding the summary judgment issue, the insurers have requested that this court consider everything alleged by the plaintiffs to be true. Therefore, the disparities are not material to resolving whether the trial court erred in denying the insurers' motions for summary judgment.
Using the plaintiffs' version of what transpired, Harold Bland, a person with superior knowledge of safety standards and OSHA regulations due to his work experience as a Quality Control Manager, saw Tucker in a tree using a hand bow saw to trim limbs. At this time, Tucker was already faint and physically exhausted from working in the heat, but did not communicate his condition to Harold. On learning that Tucker's chain saw was broken, Harold offered the use of his chain saw. Initially, Tucker declined and stated he was about ready to come down but then accepted Harold's offer. Harold left to get his chain saw while Tucker remained in the tree. Without checking the gas, Harold attempted to start the chain saw, but was unsuccessful. Harold passed the saw up to Tucker who, after several tries, was also unable to start the saw. Tucker passed the saw back to Harold who then realized it might be out of gas. Feeling exhausted and faint, Tucker started down the ladder, but Harold instructed him to stay in the tree. Tucker attempted to *626 comply, but fell while Harold was going to get gas. In getting the saw and then going for gas, Harold was trying to be helpful.
The initial inquiry is whether a causal relationship exists between the harm suffered by the plaintiff and the alleged negligent conduct of the defendant. Cause in fact is generally a "but for" inquiry, which requires Tucker to show he would not have sustained injury but for Harold's conduct. Vig v. City of Shreveport, 28,530 (La.App. 2 Cir. 8/21/96), 679 So.2d 524, writ denied, 96-2285 (La.11/15/96), 682 So.2d 775. The "substantial factor" test is an alternative method for determining cause in fact, particularly when multiple causes are present. Under either method, it is irrelevant in determining cause in fact whether the defendant's actions were lawful, unlawful, intentional, unintentional, negligent or non-negligent. The cause in fact inquiry is a neutral one, free of the entanglements of policy considerationsmorality, culpability or responsibilityinvolved in the duty-risk analysis. If the defendant's conduct was a substantial factor in bringing about the plaintiff's harm, cause in fact is established. Roberts v. Benoit, 605 So.2d 1032 (La.1991).
The Tuckers assert that, even if Harold was only 1% responsible for the accident, they are entitled to recover. In plaintiffs' view, Tucker would not have fallen but for Harold's failure to use his superior knowledge of fall protection, Harold's failure to permit Tucker to come down from the tree on two occasions, and Harold's passing the saw which would not start. While specifically not finding Harold's conduct to be a cause in fact of the accident for the purposes of reviewing de novo these motions for summary judgment, we will assume Harold's conduct to be a cause in fact of the fall.
Therefore, we must examine what legal duty, if any, Harold owed to Tucker under the facts as alleged by the plaintiff. In Shipley v. Shipley, 30,283 (La.App.2d Cir.2/25/98), 709 So.2d 901, this court stated that when plaintiffs rely on a general rule of law, such as La. C.C. art. 2316[1], the court must determine whether the rule is intended to protect that plaintiff from the particular risk of harm suffered. This analysis considers causation, factual and legal, the source and scope of the duty urged. The existence and scope of a duty depends on a case-by-case analysis of the standard of care required of each defendant under the particular circumstances.
In assessing a landowner's liability under Art. 2316 of the Civil Code, the proper test is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others. The duty of a landowner is not to insure against the possibility of an accident on his premises, but rather to act reasonably in view of the probability of injury to others. Thus the landowner is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care or which was as obvious to the plaintiff as to the landowner. To find no liability in cases involving issues of landowner fault, the court must find that the defendant did not act unreasonably vis-a-vis the plaintiff, or cause injury to the plaintiff through the instrumentality of an unreasonably dangerous thing in his custody. The issue here is whether or not Harold acted unreasonably toward Tucker. Shipley, supra.
The Tuckers assert that Harold who had a superior knowledge of safety standards breached a duty to Tucker when Harold took over and assumed control of Tucker's tree trimming operation by ordering Tucker to use a chain saw instead of the bow saw and telling Tucker to just stay in the tree when he tried to come down. In *627 plaintiffs' view, Harold had a duty to advise Tucker of relevant safety standards, warn of safety hazards, and provide Tucker with safety equipment. Further, they contend that Harold did not properly supervise Tucker's work. The Tuckers also maintain that Harold had a duty to fill the saw with gas or determine why it would not start before sending the chain saw up to Tucker. The Tuckers urge that Harold created unreasonable risks of harm when he forced Tucker to try to start the saw up in the tree and when he commanded Tucker to stay in the tree notwithstanding his exhaustion. The Tuckers also assert that the tree trimming was not gratuitous but was required by the arrangement under which the Blands permitted the Tuckers to reside rent free on the property.
The insurers correctly contend that the pleadings, depositions, admissions and affidavits on file show that plaintiffs have not satisfied the duty/risk analysis, which makes the granting of summary judgment in their favor appropriate. Tucker's own statements refute plaintiffs' conclusory contentions that Harold negligently and improperly took over and supervised Tucker's limb trimming chore. Harold was not involved in the limb trimming chore which Tucker had assigned himself. Neither of the Blands instructed Tucker to trim trees, to cut particular limbs or to use any specific method. Tucker declined Harold's initial offer of assistance before Harold went to tend his cattle. When Harold returned and offered the use of his chain saw, Tucker acquiesced after initially declining. Although he had told Harold he was ready to come down, Tucker stayed in the tree and did not disclose his exhausted condition. Tucker stated Harold was trying to be helpful when he obtained the saw and told Tucker to stay in the tree while he got the gas.
Notwithstanding the Tuckers' contention that Tucker was forced by his rental arrangements with the Blands to obey Harold's instructions, the plaintiffs supplied no such evidence. No one stated that the Tuckers had ever been given any instruction by the Blands about any particular work to be done on the premises. Tucker attributed his compliance with Harold's telling him to stay in the tree to a practice he had developed over the years of letting Harold have his way so Tucker could get along with him. (Our emphasis).
Harold's duty in this unfortunate situation was to be reasonable. Even applying the Tuckers' version of everything that took place prior to the fall, the plaintiffs have supplied no evidence that Harold was unreasonable. Acknowledging that Harold was attempting to be helpful, the older man tried to supply Tucker a power saw to replace the hand saw Tucker was using for an arduous task. Assuming Harold forgot to check the gas and told Tucker to stay in the tree while Harold put gas in the saw, Harold, who did not know of Tucker's exhausted and faint condition, was trying to save Tucker extra labor.
The unreasonable actions which resulted in this catastrophic injury were Tucker's own. Because Harold was "senior" to him and had a take-charge attitude, Tucker complied with Harold's instructions to accommodate him, a practice Tucker had adopted over the years to get along with Harold. However laudable and respectful his intentions, Tucker's efforts to defer to the older man were unreasonable and dangerous. Aware that he had exceeded his physical reserves of strength well before Harold's attempts to assist, Tucker, by his own admission, used poor judgment. Tucker admitted that a man who knows he is going to faint ought to be able to say no when told to stay in the tree. Tucker described himself as a workaholic who had a habit of using poor judgment concerning the amount of work he did.
Since we have assumed that plaintiffs' account of what transpired is correct, there are no genuine issues of material fact, notwithstanding the discrepancies in the accounts of what took place prior to this fall. Harold's duty was to behave reasonably. The plaintiffs provided no evidence *628 to show either a special relationship arose out of the Tuckers' occupancy of the Bland property or an obligation mandating Tucker to obey Harold to his own detriment. Experienced in tree trimming, Tucker was at least as aware as Harold of the dangers inherent in climbing a tree to cut limbs. Not having ordered, instructed or requested Tucker to cut the limbs nor having prescribed how the job was to be done, Harold was not supervising Tucker, only attempting to assist. Had Harold not intervened, Tucker may well have gotten himself down from the tree before his terrible fall. Straight forward and candid in his accounts of this tragic accident, Tucker acted unreasonably in ignoring his own physical distress. Under the facts and circumstances as presented by the plaintiffs, Harold was not shown to have breached his duty to act reasonably. Therefore, the trial court erred in denying the insurers' motions for summary judgment.
A jury performs the balancing test for breach of duty or negligence. Only in that small percentage of cases where reasonable minds could not differ on the outcome of balancing all of the factors is summary judgment appropriate. This is such a case.

DECREE
These writs are granted. The judgment denying the insurers' motions for summary judgment is reversed and summary judgments are entered in favor of United Fire & Casualty Company, American Central Insurance Co., and American National Property and Casualty Company. Plaintiffs's action against these defendants is dismissed with prejudice at plaintiffs' costs.
REVERSED AND SUMMARY JUDGMENTS GRANTED.
NOTES
[1] La. C.C. art. 2316 states: "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence and his want of skill."